Filed 2/22/24  In re David B. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| In re DAVID B., a Person Coming Under the Juvenile Court Law. | B329813 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>V.B.,<br><br>     Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP05098A) |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa Brackelmanns, Judge Pro Tempore. Conditionally affirmed and remanded with instructions.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Appellant.

Amir Pichvai, for Plaintiff and Respondent.

_____

Mother, V.B., appeals from an order terminating her parental rights over her son, David B., at a Welfare and Institutions Code section 366.26[1] hearing.  She contends the order must be reversed because the Department did not provide notice of the proceedings to her conservator and the trial court abused its discretion by denying her request to continue the hearing.  We conclude any error in failing to provide notice to mother's conservator was harmless beyond a reasonable doubt and that the court did not abuse its discretion.

Mother also argues the Department of Children and Family Services (Department) did not comply with its initial inquiry duty under the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) and related California law.  The Department agrees, as do we, that the requirements imposed by ICWA were not satisfied.  Accordingly, we conditionally affirm the order and remand the matter to ensure compliance with ICWA.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.    Detention**

In September 2020, a few days after mother gave birth to David, the Department received a referral alleging mother was under a "L[anterman] P[etris] S[hort] conservatorship" due to her

_____

[1]     All statutory references are to the Welfare and Institutions Code.

2

"severe" mental health condition. Mother's conservator at the time was a public guardian, but the public guardian informed a social worker there was a court hearing set for October 14, 2020, to see if David's maternal grandfather would be appointed mother's conservator.

It was reported mother suffered from schizophrenia and had a history of methamphetamine addiction. Mother allegedly was delusional, hearing voices, and not coherent. Because of mother's "cognitive and functional impairment[s]," it was reported mother was unable to care for herself or her newborn child. Mother allegedly had "psychotic and paranoia episodes very often." Her psychiatrist explained, "[Mother] '[r]equires 24/7 supervision if she is with [David]'" and added mother could be a danger to others if she did not take her medication.

A few days later, the Department filed a section 300 petition on David's behalf alleging mother's mental and emotional issues and substance abuse placed David at risk of serious harm.[2] The ICWA-010(A) inquiry form attached to the petition indicated mother and her public guardian stated David had no known Indian ancestry. After the detention hearing, where the juvenile court detained David in shelter care, maternal grandfather was appointed mother's conservator.

Mother, maternal grandfather, and mother's counsel appeared for mother's arraignment in early November 2020. The matter was continued to the following day to allow mother's counsel to speak with mother and maternal grandfather. The

---

[2] The petition additionally alleged David's half-sibling, E.V., was a prior dependent of the juvenile court due to mother's substance abuse. In August 2016, the juvenile court terminated jurisdiction over E.V. with sole legal and physical custody granted to E.V.'s father and monitored visits ordered for mother.

3

next day, the juvenile court conducted a hearing and determined mother did not need a guardian ad litem to proceed with the dependency hearings. The court further inquired whether mother had any "American Indian heritage," to which mother's counsel replied, "[N]o, she does not." An ICWA-020 parental notification of Indian status form was also filed by mother's counsel on mother's behalf indicating she did not have any Indian ancestry. The court found ICWA did not apply to mother. In addition, nonparty J.D. was found to be David's alleged father. David remained detained in shelter care and monitored visitation was ordered for mother.

## B. Jurisdiction and Disposition Report and Hearing

David was later placed with his maternal great aunt, R.C. Mother was living with maternal grandfather, who reported that he took care of mother "'24/7.'" The social worker interviewed mother about the petition's allegations, and mother claimed, "'I just have stress and anxiety. I don't see things, not me. Someone is doing this to me. I know people can do this to me through the internet. . . . I do hear voices they ask me for money. They ask me that if when my mom dies am I willing to give the voices money [*sic*].'" Mother further stated she had been put on "'many 5150 holds . . . because of the drugs'" and confirmed she had a long history of methamphetamine use. Mother visited with David, but David's caregiver, R.C., expressed mother would not engage with the child and appeared to be disconnected during visits.

The social worker also interviewed maternal grandfather. Maternal grandfather stated there had "been so many hospitalizations. Countless times" "because of the amount of

4

drugs she consumed so the [doctors] probably thought she was trying to [commit] suicide." Maternal grandfather revealed mother told him the voices she heard wanted her to relapse.

At the adjudication hearing in January 2021, the juvenile court sustained the petition as pled. David was declared a dependent and removed from parental custody. The juvenile court ordered the Department to provide reunification services to mother. Visitation was ordered to remain monitored.

## C.    Six-Month Review Period

Mother continued residing with maternal grandfather and was in partial compliance with her case plan. During this period, mother was hospitalized multiple times due to methamphetamine use and experiencing "psychotic and paranoia episodes." Mother told the social worker she was hearing voices in her head urging her to use methamphetamine and was having recurring thoughts of using the drug again.

Mother was dropped from her court-ordered programs due to her hospitalizations. When not hospitalized, mother was compliant with her visitation, although she only visited for one to two hours. While mother at times appeared coherent at visits, David's caregiver stated in most instances mother appeared slow in processing information and looked sedated.

At the six-month review hearing in August 2021, the juvenile court found mother was in partial compliance with her case plan and continued reunification services.

**D. 12-Month Review Period**

In October 2021, J.D. was found to be David's biological father. The juvenile court ordered reunification services for J.D. and found ICWA did not apply to him.

During this review period, mother experienced consecutive hospitalizations for her mental health that precluded her from completing her case plan. The social worker was unable to contact mother during this period. Further, mother was unable to visit David regularly due to her hospitalizations. For visits that did occur, R.C. reported mother visited for only 20 to 30 minutes and rarely was able to meet David's needs. R.C. indicated mother continued lacking parenting skills "due to being withdrawn and having difficulty making functional and rational choices to increase her bonding." R.C. stated that during a visit, mother secretly gave David a Cheeto that caused David to start choking. R.C. had to quickly remove the Cheeto from David's throat "as [mother] sat there with a blank stare." R.C. believed maternal grandfather was not ensuring mother was complying with her medications.

At the 12-month review hearing in November 2021, the juvenile court found the parents' compliance with their case plans was not substantial, but their services were continued.

**E. 18-Month Review Period**

Mother was again hospitalized multiple times for her mental health issues and made little progress with her court-ordered case plan. Mother's visits were inconsistent and lasted only 20 to 30 minutes each. R.C. continued reporting mother lacked parenting skills and was hearing voices. The Department

assessed there was a high risk of harm to David's physical and emotional health if returned to mother's custody.

At the 18-month review hearing in June 2022, the juvenile court determined mother's progress in her case plan was unsubstantial and terminated her reunification services. As to J.D., his reunification services were continued for four months.

Because R.C. and her husband were unable to provide a permanent home for David, he was placed with a paternal uncle and his fiancé in September 2022. Concerning ICWA, in January 2023, R.C. told the Department her family did not have any Indian heritage. At a review hearing in early October 2022, at which neither mother nor maternal grandfather appeared, J.D.'s reunification services were terminated. The court then set a section 366.26 hearing for January 31, 2023, to select and implement a permanent plan for David.

## F.    Section 366.26 Hearings

The Department subsequently served mother with notice of the section 366.26 hearing by certified mail, return receipt requested. The Department's report for the hearing was not attached to the notice.

Mother was present at the section 366.26 hearing on January 31, 2023, without maternal grandfather. The juvenile court asked mother's counsel whether counsel had any objection to the court finding notice of the hearing was proper. Mother's counsel had no objection. The Department informed the court additional time was needed to obtain all adoption readiness documents. The court continued the matter to May 1, 2023, to allow the Department to complete the adoption assessment and ordered mother back for the continued hearing.

7

After David was placed with his paternal caregivers in September 2022, mother did not have any visits until February 2023. The paternal caregivers did not have mother's contact information and incorrectly believed mother's visitation rights were terminated. Mother also stated she did not have the caregivers' contact information but wanted visits. When visits resumed, it was reported mother still did not engage with David and instead followed maternal grandfather while he followed David. The Department attempted to address these issues with mother and maternal grandfather via text message in March 2023 but did not receive a response.

The Department served notice of a review hearing set for April 3, 2023, on mother and maternal grandfather. Neither appeared at the hearing, and the juvenile court ordered adoption as the permanent plan for David. Notice of the May 1, 2023, section 366.26 hearing was then sent to mother by first-class mail at maternal grandfather's residence.

Neither mother nor maternal grandfather were present at the May 1, 2023, hearing. Mother's counsel explained he was not able to contact mother but "did speak with the maternal grandfather, who indicated mother may be in an inpatient drug program." Mother's counsel requested a continuance to make further efforts to reach mother but admitted, "I concede notice is proper." The court denied the continuance request. Mother's counsel then argued the parental benefit exception to adoption applied and requested a plan of legal guardianship be ordered. The court determined no exception to adoption applied and terminated parentals rights. Lastly, the court found there was no reason to know David was an Indian child as defined under ICWA.

Mother timely appealed the order.

## DISCUSSION

### A. Any Failure to Give Mother's Conservator Notice of, or Require Her Conservator to Appear for, the Section 366.26 Proceedings was Harmless Beyond a Reasonable Doubt

Mother asserts notice to her of the section 366.26 proceedings was improper because her conservator, maternal grandfather, did not get notice of the hearings and was not provided with copies of the Department's section 366.26 reports. Further, mother asserts the juvenile court should have ordered mother's conservator to appear for the proceedings but did not do so. The Department argues, in pertinent part, that any failure to give notice to mother's conservator or require him to be present for the proceedings was harmless beyond a reasonable doubt. We agree with the Department.

Until parental rights are terminated, parents are entitled to notice at each step of the juvenile proceedings as a matter of statute and due process. (§ 294; *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 106.) Notice must be reasonably calculated to apprise the parent of the pendency of the action and afford the parent an opportunity to present any objections. (*In re Daniel S.* (2004) 115 Cal.App.4th 903, 909 (*Daniel S.*).) Additionally, a failure to provide parents with a copy of the social worker's report that the juvenile court will rely on in coming to a decision is a denial of due process. (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 413.) However, errors in notice do not automatically require reversal. (*Daniel S.* at p. 912.) We review such errors to

9

determine whether they are harmless beyond a reasonable doubt. (*Id.* at pp. 912–913.)

Furthermore, "when a dependency court is informed that a conservator has been appointed for a party, the dependency court also has a sua sponte obligation either to appoint a [guardian ad litem] for that party or to order that the party shall appear through his or her conservator." (*In re A.C.* (2008) 166 Cal.App.4th 146, 155.) But the failure to appoint a guardian ad litem or to compel a parent's conservator to appear does not violate due process rights and is subject to the harmless error standard. (*Id.* at pp. 148, 157 [we do not set aside the judgment unless a different result would have been probable had the error not occurred].)

The record does not show maternal grandfather was served with notice of the section 366.26 hearings or provided with copies of the Department's reports prepared for the proceedings. However, when asked by the juvenile court whether there was any objection to finding notice of the January 31, 2023, hearing was proper, mother's counsel affirmatively stated there was none. At the May 1, 2023, hearing, mother's counsel expressly conceded notice was proper.[3] A party's failure to object to lack of notice forfeits the issue on appeal. (*In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1419; *In re P.A.* (2007) 155 Cal.App.4th 1197, 1209–1210.) Nevertheless, as the Department does not assert mother forfeited the issues regarding notice she raises, we reach the merits of mother's arguments.

---

[3] Given that mother's counsel conceded notice was proper and stated counsel had spoken with maternal grandfather before the hearing, the court could have reasonably inferred maternal grandfather had actual notice of the hearing. (See *In re Desiree M.* (2010) 181 Cal.App.4th 329, 335.)

Mother cites to *Daniel S.*, *supra*, 115 Cal.App.4th 903, in contending the failure to properly notice maternal grandfather was prejudicial. In *Daniel S.*, the child was placed in protective custody after the mother, "a chronic paranoid schizophrenic," "was placed on a section 5150 hold because she was considered a danger to herself and others." (*Id.* at p. 908.) After a temporary conservatorship was established over the mother, the juvenile court appointed a guardian ad litem for her. (*Id.* at pp. 909, 911, fn. 7.) Thereafter, the juvenile court sustained the petition against mother at the jurisdiction and disposition hearing. (*Id.* at p. 909.)

The mother appealed, arguing the jurisdiction and disposition orders had to be reversed because she was not properly noticed. (*Daniel S.*, *supra*, 115 Cal.App.4th at p. 909.) The appellate court held the social services agency did not have to serve the mother with notice, given her mental state. (*Id.* at p. 911.) Instead, notice of the proceedings should have been served on the mother's temporary conservator, and thus, she was not properly notified of the hearing. (*Id.* at pp. 911–912.) However, the failure to provide notice to the mother's conservator was harmless beyond a reasonable doubt because the result of the hearing would have been the same. (*Id.* at p. 914.) "There was simply no defense to the petition and no alternative but to remove [the child] from [the mother's] care." (*Ibid.*) At the time of the hearing, she was still hospitalized and could not care for herself or anyone else, and she was not stabilizing on her medication. (*Ibid.*)

Here, mother contends that unlike in *Daniel S.*, the failure to notice maternal grandfather was prejudicial because maternal grandfather could have ensured mother appeared, or could have

11

appeared himself and explained mother's absence, if he was properly noticed. Even if we assume it was error not to provide maternal grandfather with notice of the hearings or copies of the Department's reports, or to otherwise require maternal grandfather to appear, mother does not show reversal of the order terminating her parental rights is required. The main issues at a section 366.26 hearing are whether the child is likely to be adopted and whether there is a statutory exception to adoption. The evidence supported the finding David was likely to be adopted, as the paternal caregivers he was placed with were attached to David and wanted to pursue adoption. And David was observed to be well-bonded with the paternal caregivers and referred to them as "'mom'" and "'dad.'"

Once the juvenile court finds it is likely the child will be adopted, section 366.26, subdivision (c)(1), requires termination of parental rights unless an exception in subdivision (c)(1)(A) or (c)(1)(B) applies. One of these is the parental benefit exception, which mother's counsel argued applied at the May 1, 2023, hearing. (§ 366.26, subd. (c)(1)(B)(i).) In order to establish this exception applies, a parent must prove three elements: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) that "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) that terminating the parent-child attachment "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 636.)

The record shows mother could not have established the parental benefit exception in this case, and neither mother's nor

12

maternal grandfather's appearance would have changed this result.  Mother's visitation throughout the duration of the case was sporadic and inconsistent.  When mother did have visits, she did not engage with David and was largely unable to meet his needs.  During the 12-month and 18-month review periods, mother visited for only 20 to 30 minutes and appeared withdrawn.  Mother's counsel did not object to any of the Department's evidence at the May 1, 2023, hearing.  Nor was the evidence contradicted.  Moreover, nothing in mother's history of visits suggests she formed a connection with David sufficient to warrant finding the termination of parental rights would be detrimental to David.

Mother contends she or maternal grandfather could have objected to the interruption in visitation she experienced after David was placed with the paternal caregivers if mother or maternal grandfather were present for the hearing.  However, mother stops short of claiming such an objection would have impacted the juvenile court's analysis of the parental benefit exception.  The record shows that once visits resumed, the quality of visits continued to be poor as mother was still not engaging with David.  Perhaps this is why mother's counsel, who spoke with maternal grandfather before the hearing, did not raise an objection based upon the interruption in visits.

Based on the foregoing, any error in the Department failing to give maternal grandfather notice of the section 366.26 hearings, to provide copies of the section 366.26 reports, or to compel maternal grandfather to appear was harmless beyond a reasonable doubt.  (*Daniel S.*, *supra*, 115 Cal.App.4th at p. 914; see also *In re James F.* (2008) 42 Cal.4th 901, 918 [reversal not

13

required where outcome of proceeding not affected by lack of notice].)

**B. The Juvenile Court Did Not Abuse its Discretion in Denying the Request to Continue the Section 366.26 Hearing**

Next, mother argues the trial court abused its discretion in denying her counsel's request for a continuance at the May 1, 2023, hearing. We disagree.

"Section 352 provides that courts may 'continue any hearing' under the dependency law 'beyond the time limit within which the hearing is otherwise required to be held' (§ 352, subd. (a)(1)), provided there is 'good cause' (*id.*, subd. (a)(2)) and a continuance would not be 'contrary to the interest of the minor' (*id.*, subd. (a)(1)). In evaluating the minor's interest, the court 'shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.'" (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 632.) We review the juvenile court's decision to deny a continuance for abuse of discretion. (*In re D.Y.* (2018) 26 Cal.App.5th 1044, 1056.) A court abuses its discretion when its decision is arbitrary, capricious, or patently absurd and results in a manifest miscarriage of justice. (*Ibid.*) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

14

At the May 1, 2023, hearing, after informing the juvenile court maternal grandfather indicated mother may be in an inpatient drug program, mother's counsel requested a continuance "out of an abundance of caution" so that counsel could make further efforts to "discuss with mother the recommendations for today and obtain any information about . . . progress in programs." Counsel did not identify any other basis for a continuance. Mother's counsel conceded notice for the hearing was proper, and mother offers no explanation as to why any other information maternal grandfather had about mother's whereabouts could not have been shared with counsel prior to the hearing.

Although mother asserts she "would likely have appeared" for a continued hearing date and testified about interruptions in her visitation and her bond with David, as discussed above, mother does not establish her testimony would have changed the outcome of the hearing. Mother's counsel did not explain to the juvenile court how mother's testimony would establish an exception to adoption, such that the court should further delay David's permanent placement. The juvenile court acted within its discretion in deciding the need for prompt resolution and providing David with a stable environment outweighed mother's request for a continuance. Under these circumstances, the juvenile court's decision to proceed with the section 366.26 hearing without mother present was not arbitrary, capricious, or patently absurd.

## C. Further ICWA Inquiry was Required in this Case

Mother argues the Department failed to fulfill its duty of initial inquiry required by ICWA, as it did not inquire of several

15

known and available maternal relatives about potential Indian heritage.  The Department concedes further inquiry into David's ancestry is necessary.

"ICWA was enacted to curtail 'the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement' [citation], and 'to promote the stability and security of Indian tribes and families by establishing . . . standards that a state court . . . must follow before removing an Indian child from his or her family' [citations]." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 780, review granted Sept. 21, 2022, S275578 (*Dezi C.*).)  Whether ICWA applies depends on whether the child who is the subject of the custody proceeding is an Indian child.  (*In re Abbigail A.* (2016) 1 Cal.5th 83, 90.)  Both ICWA[4] and state statutory law define an "Indian child" as a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.  (25 U.S.C. § 1903(4); accord, § 224.1, subds. (a), (b).)

Under state law, the juvenile court and the Department have "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9, 11–12.)  The duty of inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian

---

[4]     Our state Legislature incorporated ICWA's requirements into California statutory law in 2006.  (*In re Abbigail A.*, *supra*, 1 Cal.5th at p. 91.)

16

child."[5] (§ 224.2, subds. (a), (b).)  If this initial inquiry creates a "reason to believe" a child is an Indian child, the Department is required to "make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (§ 224.2, subd. (e); *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)  The juvenile court may find that a child is not an Indian child if the agency's "proper and adequate" inquiry and due diligence reveals no "reason to know" the child is an Indian child.  (§ 224.2, subd. (i)(2); *In re D.S.*, *supra*, 46 Cal.App.5th at p. 1050.)  "We review claims of inadequate inquiry into a child's Indian ancestry for substantial evidence." (*In re H.V.* (2022) 75 Cal.App.5th 433, 438.)

Mother contends the Department failed to fulfill its duty of initial inquiry required by ICWA and state law.  The Department concedes its inquiry efforts as to mother's heritage were insufficient, and we agree.  Aside from asking mother, maternal grandfather, and R.C. about possible Indian ancestry, the Department failed to discuss mother's heritage with any other maternal relatives.  ICWA requires social services agencies to ask a child's available extended family members whether the child is or may be an Indian child.  (§ 224.2, subd. (b).)  The Department did not ask any of the several maternal relatives it had contact with or was aware of about David's potential status as an Indian child.  The Department further concedes its inquiry error in this case was prejudicial and further investigation into David's Indian ancestry is warranted.  We agree and remand for the Department

---

[5]    "[E]xtended family members" include adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [adopting federal definition].)

to conduct further investigation into David's Indian ancestry through mother.

## DISPOSITION

The order terminating mother's parental rights is conditionally affirmed. The matter is remanded with instructions to the Department and the juvenile court to conduct further ICWA inquiry as soon as practicable. If that inquiry reveals evidence of Native American heritage, then the Department and the court must comply with the additional ICWA requirements, including, if applicable, the notice requirements of section 224.3. If it does not, then the order shall stand.

MORI, J.

We concur:

CURREY, P. J.

COLLINS, J.

18